## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| | : | **Case Nos.: 1:16-CR-236 (VM) and** |
| **Plaintiff** | : | **1:17-CR-262 (LGS)** |
| | : | |
| **v.** | : | |
| | : | |
| **NATHAN ITZCHAKI,** | : | |
| | : | |
| **Defendant** | : | |

## EXPEDITED MOTION TO REDUCE SENTENCE
## PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)(i)

Joseph E. Sarachek, Esq.
Sarachek Law Firm
101 Park Avenue, 27th Floor
New York, New York  10178
Tel: (646) 517-5420
Counsel for Nathan Itzchaki

TO:   Audrey Strauss, Esq.
      United States Attorney
      Southern District of New York
      One St. Andrew's Plaza
      New York, New York  10007
      Attn: AUSAs Thomas McKay/Drew Turner Johnson Skinner/Jacqueline Christine Kelly

1

Defendant Nathan Itzchaki moves the Court for an order reducing his sentence to time served, with or without a period of home confinement, based on the "extraordinary and compelling reasons" discussed below, pursuant to the newly amended 18 U.S.C. § 3582(c)(1)(A)(i).  Mr. Itzchaki's continued confinement in federal prison places him in great danger of exposure to COVID-19, to which his advanced age and medical history leave him acutely vulnerable.

## INTRODUCTION

Nathan Itzchaki, 61, is incarcerated at FCI Cumberland, in Cumberland, Maryland, serving 66 months for wire fraud. His date of release is currently projected as June 2023.  However, federal prisons are experiencing a widespread outbreak of COVID-19, with more than 7275 inmates and staff already having tested positive. As the Court knows, prisoners are at greater risk of contracting the virus simply due to the heightened level of exposure inherent in the nature and standard conditions of incarceration.

COVID-19 is not always deadly, but it can be for older inmates like Mr. Itzchaki, who also has high blood pressure, diabetes, and skin cancer. Many federal courts around the country have granted motions for compassionate release during the COVID-19 crisis to inmates who are far less at risk than Mr. Itzchaki. Mr. Itzchaki made a compassionate release request to FCI Cumberland's warden more than 30 days ago, which permits this Court to decide this motion under 18 U.S.C. § 3582(c)(1)(A). We request that the Court reduce Mr. Itzchaki's sentence to time served, with or without home confinement.

## FACTUAL BACKGROUND

### A.     Nathan Itzchaki's Wire Fraud Conviction and Sentence

On March 24, 2016, Nathan Itzchaki was found guilty of one count of wire fraud under 18 U.S.C. § 1343. *United States v. Itzchaki*, No. 16-CR-236 [hereinafter *Itzchaki*], ECF No. 8. On May

1, 2017, he was convicted of three counts of conspiracy to commit mail fraud under 18 U.S.C. § 1349. *United States v. Sezanayev*, No. 17-CR-262 [hereinafter *Sezanayev*], ECF No. 69.

Mr. Itzchaki operated the Buy Right Diamond Corp., selling diamonds wholesale in New York's diamond district. In early 2016, Mr. Itzchaki conspired to file false insurance claims for a failing colleague in the business who was hoping to cash in on the scheme. Presentence Investigation Report dated March 15, 2017 at ¶ 10. Later that year, Mr. Itzchaki was involved in a conspiracy to refuse payment for diamonds purchased in India, eventually owing the vendors $3.3 million. Presentence Investigation Report dated November 6, 2018 at ¶¶ 85-86.

Nonetheless, the sentencing submissions displayed Mr. Itzchaki's hardworking, generous, and compassionate traits, by which he is widely known. Itzchaki Sentencing Mem., *Itzchaki*, ECF No. 50. Mr. Itzchaki is an immigrant who arrived alone from the Former Soviet Union at a young age. After he married, his primary concern was supporting his family, which he did with dedication whether it meant driving a taxi or opening a new diamond business when his earlier ventures failed. Life was not easy for Mr. Itzchaki—he lived through the death of his parents, knew only poverty, and endured a difficult marriage with a depressive wife—yet he maintained his dignity and continued trudging on, head held high. When Uzbek émigrés began to flock to New York after the fall of the communist regime, Mr. Itzchaki saw an opportunity to help. With his friend's assistance, Mr. Itzchaki founded a cultural center in Starrett City to help those immigrants acclimate to their new home. As part of his sentencing submissions, The Aleph Institute (an advocacy organization) wrote that Mr. Itzchaki hosted his uncle, aunt, and their four sons upon their immigration. Despite their financial difficulties, Mr. Itzchaki and his wife shared whatever resources they could providing food, shelter, advice, and emotional support. *Itzchaki*, ECF No. 51.

Mr. Itzchaki is a proud father and grandfather. He has three children: Jonathan and Elizabeth, who are married with children as well; and Menachem, an adolescent boy who has yet to make peace with his father's incarceration. Mr. Itzchaki plays a big part in his family's life. His daughter-in-law, Oksana, describes Mr. Itzchaki as a "kind and caring individual" who always makes time for her children when they need advice or support; they consult with Mr. Itzchaki before every major decision in their lives and claim that "his caring nature" helped resolve many of their problems.

On July 1, 2019, Mr. Itzchaki was sentenced to five and a half years in prison to be followed by three years' supervised release. Mr. Itzchaki was also ordered to pay more than $3.5 million in restitution. *Sezanayev*, ECF No. 525. Although Mr. Itzchaki's official release date is June 13, 2023, under the First Step Act elderly pilot program, he is eligible for release to home confinement in three years; sooner, if the Senate passes currently pending bi-partisan legislation. As recently as June 24, 2020, Senators Durbin and Grassley proposed the "COVID-19 Safer Detention Act of 2020" which would allow home confinement for elderly inmates half-way through their sentences.[1] If this bill passes, Mr. Itzchaki might be eligible for home confinement in about two years.[2]

### B.     Mr. Itzchaki's Home Confinement Request is Approved, Then Denied

Mr. Itzchaki applied for home confinement on March 22, citing his age and pre-existing health conditions. Itzchaki Request for Home Confinement to Warden, FCI Cumberland, Apr. 26, 2020, attached as **Exhibit A**. The warden promptly denied his request pursuant to 18 U.S.C. § 3624(c)(2)

---

[1] COVID-19 Safer Detention Act of 2020, 116th Cong. §3 (2020), https://www.durbin.senate.gov/imo/media/doc/ALB20801.pdf.

[2] Mr. Itzchaki qualifies for the elderly pilot program as he is over 60 and his crime was not one of violence or a sex offense. *See* Home Confinement Under the First Step Act (FSA), BOP Memorandum, available at: https://www.bop.gov/policy/om/001-2019.pdf, citing 34 U.S.C. § 60541(g). Eligible inmates complete their sentences in home confinement after serving two-thirds of their terms. *Id.* Two-thirds of Mr. Itzchaki's 66-month sentence is 44 months. Mr. Itzchaki began his sentence in October 2019, so he has served 8 months, leaving 36 months before his FSA home confinement. However, factoring in the "COVID-19 Safer Detention Act" which amends the two-thirds requirement, mandating that the elderly inmate serve only half of his or her sentence before home confinement eligibility, Mr. Itzchaki would be eligible for home confinement in two years.

which only allows home confinement "the shorter of 10 percent of the term of imprisonment . . . or 6 months." *Id.* at 1. Soon after, Attorney General William Barr released his Memorandum for the Director of the Bureau of Prisons, using the CARES Act to expand home confinement eligibility beyond § 3624 to inmates who satisfy certain criteria no matter how much time remained on their sentence.[3]

The prison assured Mr. Itzchaki that he would be released to home confinement. On May 7, 2020, the prison filed the paperwork necessary to approve his release and wrote, "[Mr. Itzchaki] was identified by Health Services as a 'High Risk' due to his medical conditions." Home Confinement Papers, May 7, 2020, attached as **Exhibit B[4]**, at 8.

Mr. Itzchaki clearly satisfies AG Barr's criteria for home confinement:

- At 61 with hypertension, diabetes, and skin cancer, he is at increased risk of contracting COVID-19 in prison;
- FCI Cumberland is a medium security facility;
- He has not engaged in violent or gang-related activity in prison;
- He has a minimum score under PATTERN;
- His crime of conviction was nonviolent and economic;
- Lastly, Mr. Itzchaki has a "demonstrated and verifiable re-entry plan." Specifically, he would be living in the home of his wife, Rita, at their home in Fresh Meadow, New York, where he be able to quarantine himself more efficiently.

Mr. Itzchaki avers that he was denied home confinement by the central BOP office.

## C.    Mr. Itzchaki's Compassionate Release Request Was Never Addressed

On April 23, 2020, Mr. Itzchaki submitted a request for compassionate release to his camp manager at FCI Cumberland. Itzchaki Request to Camp Manager, April 23, 2020, Ex. A at 2.

On May 5, 2020,  Mr. Itzchaki's son, Jonathan Itzchakov, submitted a further request for

---

[3] Mem. from Att'y Gen. William Barr to the BOP, Apr. 3, 2020, https://www.politico.com/f/?id=00000171-4255-d6b1-a3f1-c6d51b810000 ("April 3 Barr Memo"); Mem. from Att'y Gen. William Barr to the BOP, Mar. 26, 2020, https://www.politico.com/f/?id=00000171-1826-d4a1-ad77-fda671420000 ("March 26 Barr Memo").

[4] Due to Mr. Itzchaki's privacy interests, we respectfully request that his Release Papers be filed separately under seal.

compassionate release on his behalf to the warden of FCI Cumberland.[5] In his request, Mr. Itzchakov noted: (1) his father's advanced age; and (2) his serious chronic medical conditions including high blood pressure, diabetes, and skin cancer, which leave him especially susceptible to COVID-19. *Id.* at 3.

The warden never addressed the compassionate release requests. More than thirty days have passed since both requests were filed.

## ARGUMENT

### A.    The Court Has Section 3582 Authority to Reduce Nathan Itzchaki's Sentence

The compassionate release statute was first enacted as part of the Comprehensive Crime Control Act of 1984. It provided that a district court could not modify a final term of imprisonment except in four situations, one of which was the existence of "extraordinary and compelling reasons" warranting the reduction, as determined by the sentencing court. Although the courts had the final decision-making authority over whether a sentence would be reduced, the statute imposed a gatekeeper—that authority could be invoked *only* upon a motion by the Director of the BOP. Without any action by the BOP, sentencing courts were powerless to reduce a prisoner's sentence, even if the court concluded that extraordinary and compelling reasons warranted the reduction. 18 U.S.C. § 3582(c)(1)(A)(i); *see also* PL 98–473 (H.J. Res 648), PL 98– 473, 98 Stat. 1837 (Oct. 12, 1984).

When Congress enacted the First Step Act, which amended § 3582(c)(1)(A). *See* P.L. 115-391, 132 Stat. 5194, at § 603 (Dec. 21, 2018), courts were provided with greater flexibility. Under the amended statute, a court may now reduce a sentence for "extraordinary and compelling reasons"

---

[5] A family member can make a compassionate release request on behalf of an inmate. 28 C.F.R § 571.61(b) ("The Bureau of Prisons processes a request made by another person on behalf of an inmate in the same manner as an inmate's request.").

in two circumstances: (i) upon motion of the Director of the BOP requesting such relief; or (ii) "upon motion of the defendant," if the defendant has fully exhausted all administrative remedies to appeal the BOP's failure to bring a motion, <u>or</u> if 30 days has elapsed "from the receipt of such a request by the warden of the defendant's facility," whichever is earlier. 18 U.S.C. § 3582(c)(1)(A).

Mr. Itzchaki filed a compassionate release request with the warden of his facility more than 30 days ago which makes him eligible to bring this motion before this Court. *See United States v. Feliz*, No. 16-CR-309 (VM), 2020 WL 3072284, at *1 (S.D.N.Y. June 10, 2020) (If the BOP either denies Feliz relief *or takes longer than thirty days to respond to his request*, then the Court can consider a renewed motion for compassionate release by Feliz on its merits.") (emphasis added); *United States v. Cognetta*, No. 18-CR-14 (VM), 2020 WL 2395082, at *1 (S.D.N.Y. May 12, 2020) ("Any argument that it would be futile for [defendant] to exhaust his administrative remedies is unavailing, given that the statute contains an express futility provision, permitting him to seek judicial relief if the BOP *does not act on his request within thirty days*.") (emphasis added).

The prison's overdue acquiescence to Mr. Itzchaki's *home confinement* request, cannot be considered "action taken" vis-à-vis Itzchaki's *compassionate release* request. As this Court noted in *Reese*, "Because requests for home confinement and compassionate release arise from 'ultimately different statutory schemes with different considerations underlying each,' the Court concludes it would be imprudent to treat the two requests interchangeably." *United States v. Reese*, No. 12-CR-629, 2020 WL 2554381, at *2 (S.D.N.Y May 2, 2020) (quoting *United States v Vigna*, No. 16-CR-786, 2020 WL 1900495, at *5 n.3 (S.D.N.Y. Apr. 17, 2020)). In *Reese*, the defendant filed a request for compassionate release less than thirty days before turning to the court. The court rejected his motion although the defendant had filed a *home confinement* request more than thirty days prior. This is logical because the mechanics to evaluate a compassionate release request are

7

different from those that decide home confinement. However, the logic must go both ways. While the warden at Cumberland finally evaluated and approved Mr. Itzchaki for home confinement, more than thirty days have passed, without any response from the warden, since Mr. Itzchaki's requests for compassionate release were submitted under § 3582(c)(1)(A)'s completely separate and unique statutory scheme.

The language of the statute supports this argument as well since it provides the futility exception whenever it is impossible for the inmate to "appeal a failure of the BOP to bring a motion on the defendant's behalf." An "appeal" is only possible when a decision has been made. *See Appeal*, Black's Law Dictionary (11th ed. 2019) ("A proceeding undertaken to have *a decision reconsidered* by a higher authority") (emphasis added). Therefore, if the warden did not make a decision regarding compassionate release, an appeal is impossible, triggering the 30-day futility provision.

Even courts that have held the 30-day futility provision does not apply when the warden takes action, that is only when "the warden of the facility takes . . . action *on the request* within 30 days of receiving it." *United States v. D'Acunto*, No. 18-CR-14 (VM), 2020 WL 1904007, at *2 (S.D.N.Y. Apr. 16, 2020) (quoting *United States v. Schultz*, No. 17-CR-193, 2020 WL 1872352, at *3 (W.D.N.Y. Apr. 15, 2020)).

Because the warden has not responded to Itzchaki's compassionate release request within 30 days, Itzchaki's compassionate release motion is justifiably before this Court.

### B.   Mr. Itzchaki Presents Extraordinary and Compelling Reasons for Compassionate Release

#### i.   COVID-19 continues to spread in federal prisons

By now, the details of the deadly global COVID-19 pandemic are well-known to the Court and the general public.  As of this filing, the COVID-19 respiratory disease has exponentially spread

to over 140 countries, infecting more than 10,424,992 people, and causing more than 509,706 deaths. *See COVID-19 Dashboard*, Johns Hopkins Univ., https://coronavirus.jhu.edu/map.html (last visited June 30, 2020).

While the first known case of COVID-19 in the United States was only reported in late January, the virus has spread exponentially: there are now over 2.68 million cases, already having caused 129,545 deaths. *See id.*

As of this writing, there are 205 active cases and 17 deaths in Allegany County, Maryland, where FCI Cumberland is located. *See COVID-19 Outbreak*, Md. Dep't Health, https://coronavirus.maryland.gov/, (last visited June 30, 2020).

There is currently no cure and no vaccine for COVID-19. The only way to minimize the virus is to prevent it from spreading. In addition to frequent handwashing, the CDC recommends "social distancing" or "physical distancing" by maintaining a distance of at least six feet from other people, avoiding gathering in groups, and staying out of crowded places. *Prevent Getting Sick*, CDC (April 24, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (last visited June 30, 2020). Additionally, the CDC recommends face masks be worn at all times in settings where social distancing is not possible. *Id.*

Because of the difficulty of social distancing, prisons are especially vulnerable to the spread of COVID-19. *See Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, CDC (Apr. 18, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last updated May 24, 2020); *see also Castillo v. Barr*, No. CV-20-00605 TJH (AFMx), 2020 WL 1502864, at *5 (C.D. Cal. Mar. 27, 2020) ("[T]he Government cannot deny the fact that the risk of infection in immigration

detention facilities – and jails – is particularly high if an asymptomatic guard, or other employee, enters a facility.").

As of this writing, 6558 federal inmates have officially tested positive for the virus, as have 717 staff. *See Covid-19 Coronavirus*, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/ (last visited June 30, 2020). At least 89 federal inmates have died of the virus. *Id*. Due to undertesting, among other factors, these data are most likely underreported. *See United States v. Amarrah*, No. 17-20464, 2020 WL 2220008, at *6 (E.D. Mich. May 7, 2020).

### ii.    Mr. Itzchaki satisfies the Extraordinary and Compelling criteria of the statute

In order to reduce a sentence under the compassionate release statute, the Court must find that "'extraordinary and compelling reasons' warrant such a reduction" *D'Acunto*, WL 1904007, at *3. In *D'Acunto*, the defendant did not argue that "contracting COVID-19 would exacerbate his kidney disease or otherwise present a particular or heightened risk to his health." However, as Health Services at FCI Cumberland have confirmed, Mr. Itzchaki would be at a "High Risk" should he contract COVID-19.

Mr. Itzchaki is 61 years old and suffers from hypertension, diabetes, and skin cancer (Kaposi's Sarcoma). Nathan Itzchaki Medical Records, attached as **Exhibit C**[6], at 1, and these conditions make COVID-19 especially dangerous.

**Hypertension**: Preliminary mortality rate analyses from a February 29, 2020, WHO-China Joint Mission Report indicated a mortality rate for individuals with hypertension at 8.4%. *Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19)*, World Health Org., 12 (Feb. 29, 2020), https://www.who.int/docs/default-source/coronaviruse/who-china-joint-mission-on-

---

[6] Due to Mr. Itzchaki's privacy interests in his medical records, we respectfully request that they be filed separately under seal.  Mr Itzchaki consents to the public filing of all of his health information contained in this motion.

covid-19-finalreport.pdf. *See also* Ernesto L. Schiffrin et al., *Hypertension and COVID-19 ,* 33 Am. J. Hypertension 373, 373 (May 2020), https://academic.oup.com/ajh/article/33/5/373/5816609 ("The most common comorbidities in one report were hypertension (30%), diabetes (19%), and coronary heart disease (8%)").

**Diabetes**: The CDC lists diabetics among those who are at higher risk for COVID-19 complications. *People Who Are at Higher Risk for Severe Illness*, CDC (last reviewed May 14, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html. *See also* Safiya Richardson et al., *Presenting Characteristics, Comorbidities, and Outcomes Among 5700 Patients Hospitalized With COVID-19 in the New York City Area*, JAMA (April 22, 2020), https://jamanetwork.com/journals/jama/fullarticle/2765184 ("Of the patients who died, those with diabetes were more likely to have received invasive mechanical ventilation or care in the ICU compared with those who did not . . . . The percentage of patients who developed acute kidney injury was increased in the subgroups with diabetes compared with subgroups without those conditions.").

Mr. Itzchaki is taking Losartan, an angiotensin II receptor blocker (ARB), which exacerbates his risk of death or permanent damage. Exh. C at 1; *Angiotensin II Receptor Blockers*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/high-blood-pressure/in-depth/angiotensin-ii-receptor-blockers/art-20045009 (last visited June 13, 2020);

> Hypertension is treated with ACE inhibitors and ARBs, which results in an upregulation of ACE2. . . . treatment with ACE inhibitors and ARBs increases ACE2 expression. We suggest that patients with cardiac diseases, hypertension, or diabetes, who are treated with ACE2- increasing drugs, are at *higher risk for severe COVID-19* infection and, therefore, should be monitored for ACE2-modulating medications, such as ACE inhibitors or ARBs. (emphasis added)

Lei Fang et al., *Are Patients with Hypertension and Diabetes Mellitus at Increased Risk for COVID-19 Infection?* 18 Lancet Respiratory Med. E21, Mar. 11, 2020, https://www.thelancet.com/pdfs/journals/lanres/PIIS2213-2600(20)30116-8.pdf.

*See also* Richardson, *supra* ("Mortality rates for patients with hypertension not taking an ACEi or ARB, taking an ACEi, and taking an ARB were 26.7%, 32.7%, and 30.6%, respectively.")

**Age:** Mr. Itzchaki is 61 years old, which acts to his extreme detriment as well. A recent study based on data "from individuals who tested positive for COVID-19 in 38 countries ... found that risk of death from the disease rose with each decade of age." Erin Schumaker, *Risk for Severe COVID-19 Increases with Each Decade of Age*, abcNEWS (Apr. 1, 2020), https://abcnews.go.com/Health/risk-severe-covid-19-increases-decade-age/story?id=69914642 (citing Robert Verity et al., *Estimates of the Severity of Coronavirus Disease 2019: a Model-Based Analysis*, Lancet Infectious Diseases (Mar. 30, 2020), https://doi.org/10.1016/S1473-3099(20)30243-7. In the State of New York, approximately 19.5% of fatalities occurred in people between the ages of 60 to 69, a twofold increase in fatalities from individuals in the next lower age group of people between the ages of 50 to 59. *COVID-19 Tracker*, N.Y. St. Dep't Health (accessed June 21, 2020), https://on.ny.gov/2BtIBvU.

In the COVID-19 context, courts have routinely granted compassionate release for inmates of Mr. Itzchaki's age and with his medical conditions, recognizing that their co-morbidities coupled with the pandemic present a "compelling and extraordinary" reason to do so. *United States v. Acevedo*, 18 CR 365 (LGS), 2020 WL 3182770, at *3 (S.D.N.Y. June 15, 2020) (granting compassionate release to 54-year-old inmate "on the grounds that he has been diagnosed with, among other things, diabetes, hypertension and coronary heart disease, and that these circumstances present 'extraordinary and compelling reason' that warrant a sentence reduction"); *United States v. Williams-Bethea*, 18-CR-78 (AJN), 2020 WL 2848098, at *4 (S.D.N.Y. June 2, 2020) (same for 50-year-old inmate with hypertension and obesity because "[t]his Court has repeatedly recognized that COVID-19 presents a heightened risk for individuals with hypertension, like the Defendant"); *United States v. Pena*, 15-CR-551 (AJN), 2020 WL 2301199, at *4 (S.D.N.Y. May 8, 2020) (same for 60-year-old inmate with

hypertension); *United States v. Scparta*, No. 18-CR-578 (AJN), 2020 WL 1910481, at *9 (S.D.N.Y. Apr. 20, 2020) (same for defendant with severe hypertension who was otherwise "in generally good health"); *United States v. Zukerman*, No. 1:16-cr-194-AT, 2020 WL 1659880, at *1 (S.D.N.Y. Apr. 3, 2020) (same for 75-year-old man with diabetes, hypertension, and obesity because "his age, combined with his diabetes, hypertension, and obesity, satisfy [the "extraordinary and compelling"] requirement); *United States v. Dana*, No. 3:17-cr-148-SI, 2020 WL 3056791, at *3 (D. Or. June 9, 2020) (same for "59-year-old man who is at high risk for contracting and suffering serious illness from . . . COVID-19, because of his . . . chronic health conditions" including "Kaposi sarcoma (a cancer that causes lesions and abnormal tissue to grow)"). *United States v. Sawicz*, No. 08-CR-287 (ARR), 2020 WL 1815851, at *2 (E.D.N.Y. Apr. 10, 2020) (same, finding that defendant's vulnerability to complications from COVID-19 because of hypertension constituted an "extraordinary and compelling reason" for release); *United States v. Abdallah*, No. 4:15-cr-18(3), 2020 WL 3039122, at *1-2 (E.D. Va. June 4, 2020) (same for a "60 year[] old man [who] suffers from type II diabetes" whom the BOP has "identified . . . as being high risk for serious illness if he contracts the virus"); *United States v. Early*, No. 09 CR 282, 2020 WL 2112371, at *2 (N.D. Ill., May 4, 2020) (same for inmate who "is 62 years old [and] suffers from several medical conditions, including diabetes and hypertension"); *United States v. Pabon*, No. 17-165-1, 2020 WL 2112265, at *1 (E.D. Pa., May 4, 2020) (same for a 54-year-old inmate with diabetes, hypertension and other illnesses because "[p]eople with diabetes . . . are more likely to experience dangerous symptoms if infected with COVID-19"); *United States v. Muniz*, 4:09-CR-0199-1, 2020 WL 1540325, at *2 (S.D. Tex. Mar. 30, 2020) (same because "[d]efendant has been diagnosed with serious medical conditions that . . . make him particularly vulnerable to severe illness from COVID-19 . . . includ[ing] inter alia, end stage renal disease, diabetes, and arterial hypertension."); *Amarrah*, 2020 WL 2220008, at *6

13

(same for 45-year-old man with diabetes, hypertension, cardiac arrhythmia, sleep apnea, and asthma); *United States v. Colvin*, No. 3:19cr179, 2020 WL 1613943 at *4 (D. Conn. Apr. 2, 2020) (same for defendant who has "diabetes, a serious medical condition which substantially increases her risk of severe illness if she contracts COVID-19"); *United States v. Doshi*, 13-CR-20349, 2020 WL 2556794, at *3 (E.D. Mich. May 20, 2020) (same for 64-year-old man with diabetes, asthma, and hypertension "because though [defendant] falls five months short of the age 65 threshold identified by the CDC as a risk-factor, diabetes and asthma are both risk factors for all ages" and "there is also a growing scientific consensus that hypertension may be a risk factor"); *See also Reese*, 2020 WL 2554381, at *2 (noting that "[defendant]'s various medical conditions" including diabetes and hypertension "increase the risk of negative complications from the coronavirus").

### iii.   Mr. Itzchaki is in danger even though there were only eight confirmed cases of COVID-19 at Cumberland

There have been eight confirmed cases of COVID-19 at FCI Cumberland, according to the BOP. https://www.bop.gov/coronavirus/. In the past, this Court has denied relief to inmates with grimmer prospects. *See, e.g., Reese*, 2020 WL 2554381, at *2 (denying compassionate release in part because "there have been no confirmed cases among inmates at the BOP facility where [defendant] is housed" and "other courts have denied similar requests from defendants with various medical conditions even when conditions at their BOP facilities were similar or worse." (citing *United States v. Garcia*, No. 18 CR 802, 2020 WL 2468091, at *5-6 (S.D.N.Y. May 13, 2020)). We urge the Court to reconsider its position in light of the pandemic's continued onslaught, the reality in BOP facilities, and other, more favorable, court decisions.

First, the BOP numbers are sometimes underreported because they often only test symptomatic inmates. As the Honorable Judith E. Levy recently noted:

Zero *confirmed* COVID-19 cases is not the same thing as zero COVID-19 cases. The Bureau of Prisons recently discovered this when it found that 70 percent of the inmates it tested were positive for the disease. *See* Sadie Gurman, *More Than 70% of Inmates Tested in Federal Prisons Have Coronavirus*, The Wall Street Journal (Apr. 30, 2020), https://www.wsj.com/articles/more-than-70-of-inmates-tested-in-federal-prisons-have-coronavirus-11588252023 (noting that "prison officials expect [this number] to rise as they expand testing with a focus on the hardest-hit facilities"). The Southeast Regional Vice President of the Council of Prison Locals referred to "the inside of a [prison] institution" as a "little petri dish ... a life and death situation [that prison officials then take] home to our families." *Id.* This disease spreads asymptomatically, which means the Court and the prison system can take no comfort in a lack of confirmed cases, and all parties should be deeply concerned by the lack of universal testing of inmates and staff.

*Amarrah*, 2020 WL 2220008, at *6. *See also United States v. Rodriguez*, No. 17-CR-157, 2020 WL 3051443, at *3 (S.D.N.Y. June 8, 2020) (lamenting the fact that the BOP only tests symptomatic individuals "despite common knowledge that COVID-19 can be spread asymptomatically"); *Abdallah*, 2020 WL 3039122, at *2 ("Even with these confirmed cases, the statistics about the number of infections in BOP facilities may not reflect the exact number of infections given the lack of testing."); *Pabon*, 2020 WL 2112265, at *4-5 (positing that the BOP's numbers are the result of not testing asymptomatic inmates, quoting Leonard Rubenstein, a professor at John Hopkins Bloomberg School of Public Health, "Unless you do universal testing in all environments, the risk of spread is enormous. If you are waiting for symptoms to emerge before you do the testing, you are getting a false picture of what is going on. . . . It's too late.").

Mr. Itzchaki avers that FCI Cumberland has not tested its asymptomatic inmates. E-mail from Jonathan Itchakov to Leibel Gniwisch, Intern, Aleph Inst. (June 15, 2020, 9:27 AM), attached as **Exhibit D**. Therefore, there may be many more cases than the prison claims.

Furthermore, even if there are truly no COVID-19 cases at FCI Cumberland, it makes no sense to wait for an outbreak before releasing Mr. Itzchaki, who is at great risk, has a confirmed release plan, and whose release would pose no danger to the community. Due to the fact that COVID-19

spreads quickly in a prison environment, facilities with zero cases can become deadly hotspots within a matter of days or weeks. FCI Terminal Island is a frightening example. As of April 13, 2020, that prison reported seven positive cases among its incarcerated population and two positive staff cases. By May 4, 2020, those numbers had exploded: 623 prisoners tested positive and five died.  Four more inmates have died in the weeks since. *See* Richard Winton, *Inmate Labeled as 'Recovered' from Coronavirus Dies at Terminal Island*, L.A. Times (May 28, 2020), https://www.latimes.com/california/story/2020-05-28/ninth-inmate-dies-coronavirus-terminal-island-prison. Similar outbreaks have occurred at federal prisons in Elkton, Oakdale, and Fort Worth.[7]

Many courts have recognized this reality and granted compassionate release with little or no outbreaks at the facility instead of playing Russian roulette with inmates' lives. *United States v. Blye*, No. CR15-348RSL, 2020 WL 3064225, at *4 (W.D. Wash. June 9, 2020) (granting compassionate release "[a]lthough there are currently no COVID-19 cases at [prison], and although the BOP has undertaken efforts to prevent and control outbreaks of the virus," because "[g]iven the risks, it makes little sense to wait for such an outbreak . . . ."); *Dana*, 2020 WL 3056791, at *4 (same although "BOP is not reporting any positive cases of COVID-19, either among inmates or staff, at [prison]," because "[t]he BOP does not disclose whether or to what extent a facility is testing symptomatic or asymptomatic inmates, both or neither" and the risk of outbreak remains high); *United States v. Connor*, No. CR07-4095-LTS, 2020 WL 3053368, at *8 (N.D. Iowa June 8, 2020) (same because no confirmed cases does not reflect the true number, "[n]or does it mean there will not be a future outbreak at the facility" and "[a]s the Government acknowledges, despite extensive measures to prevent transmission, more federal inmates will inevitably contract COVID-19 going forward");

---

[7] *See generally* Keri Blakinger & Keegan Hamilton, "*I Begged Them to Let Me Die:" How Federal Prisons Became Coronavirus Death Traps*, Marshall Project (June 18, 2020, 7:00 AM), https://www.themarshallproject.org/2020/06/18/i-begged-them-to-let-me-die-how-federal-prisons-became-coronavirus-death-traps.

*Doshi*, 2020 WL 2556794, at *3 ("The Court will not force [defendant] to wait until there is an outbreak at his facility before determining that the pandemic represents an extraordinary and compelling reason for his release."); *United States v. Echevarria*, No. 3:17-cr-44, 2020 WL 2113604, at *2 (D. Conn. May 4, 2020) (same, because "due to his incarceration, [defendant] is unable to safeguard against infection, and prisons are associated with high transmission probabilities for infectious diseases like COVID-19"); *Early*, 2020 WL 2112371, at *2 (holding that a *potential* outbreak in the defendant's facility "qualifies as an extraordinary reason warranting consideration of a reduction of [defendant]'s sentence" because there could be more cases at the prison than the BOP confirms and once it reaches the prison "it is likely to spread more quickly than in the general population"); *United States v. Gonzalez*, No. 2:18-CR-0232-TOR-15, 2020 WL 1536155 at *2 (E.D. Wash. Apr. 31, 2020) (releasing the inmate, reasoning that "[b]ecause it is impossible to practice social distancing or isolation in a jail setting, the pandemic will be devastating when it reaches jail populations."); *Colvin*, 2020 WL 1613943 at *4 (noting defendant's multiple health conditions and inability to social-distance in prison and concluding that "[i]n light of the expectation that the COVID-19 pandemic will continue to grow and spread over the next several weeks, the Court concludes that the risks faced by Defendant will be minimized by her immediate release to home"); *See also United States v. Demaria*, 17 CR. 569 (ER), 2020 WL 1888910, at *4 (S.D.N.Y. Apr. 16, 2020) (denying compassionate release on exhaustion grounds but noting that "[e]ven though FMC Lexington is without detected cases of COVID–19 at the time of this Opinion and Order, that situation could change with very little notice to the Government, to the Court, or, most consequentially, to [defendant]").

Courts have also routinely granted compassionate release with fewer cases than FCI Cumberland, reasoning that if COVID-19 breached the prison's walls once, it could do so again.

*Zukerman*, 2020 WL 1659880, at *1 (granting compassionate release with 1 positive inmate); *United States v. Fettis*, No. 17-cr-30003, 2020 WL 3027198, at *2 (C.D. Ill. June 5, 2020) (same with 3 positive inmates and 2 positive staff); *United States v. Smith*, No. 15-cr-30039, 2020 WL 3027197, at *1 (C.D. Ill. June 5, 2020) (same with 6 positive inmates and 6 positive staff); *Abdallah*, 2020 WL 3039122, at *2 n.3 (same with 6 positive staff); *Samy v. United States*, No. 16-20610-1, 2020 WL 1888842, at *3 (E.D. Mich. Apr. 16, 2020) (same with 2 positive inmates); *United States v. McCarthy*, No. 3:17-CR-0230, 2020 WL 1698732 (D. Conn. Apr. 8, 2020) (same with 2 positive inmates and 6 positive staff); *United States v. Rodriguez*, No. 2:03-cr-271-AB, 2020 WL 1627331, at *2 (E.D. Pa. Apr. 1, 2020) (same with 2 positive inmates); *Muniz*, 2020 WL 1540325, at *2 (same with 1 positive inmate and 1 positive staff).

In summation, Mr. Itzchaki should be granted compassionate release because of the danger COVID-19 presents to him due to his medical conditions regardless of the amount of COVID-19 cases presently at FCI Cumberland. The pandemic does not seem to be slowing and could spread to prisons in a flash; it has already spread to FCI Cumberland once and could do so again, putting Mr. Itzchaki's life in danger.

## C.   The remaining criteria for reducing the length of Mr. Itzchaki's sentence weigh strongly in favor of a sentence reduction

In determining whether Mr. Itzchaki's sentence should be reduced, the Court must decide, *inter alia*, whether he presents a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g) and U.S.S.G. § 1B1.13 (2). If he does not, the Court looks to the factors outlined in 18 U.S.C. § 3553(a). All these factors weigh strongly in favor of relief in Mr. Itzchaki's case.

### i.   Mr. Itzchaki is not a "Danger"

Mr. Itzchaki is not a danger to the community. He was convicted of a nonviolent, financial

crime and is 61 years old, a demographic that is highly unlikely to recidivate. *See* United States Sentencing Commission, *The Effects of Aging on Recidivism Among Federal Offenders*, p. 30 (December 2017), http://www.ussc.gov/sites/default/files/pdflresearch-and-publications/research-publications/20 17/20171207 Recidivism-Age.pdf ("Among offenders released younger than age 21, 67.6 percent were rearrested compared to 13.4 percent of those released age 65 or older. The pattern is consistent across age groups, as age increases recidivism by any measure declined. Older offenders who do recidivate do so later in the follow-up period, do so less frequently, and had less serious recidivism offenses on average.").

### ii.    The Relevant § 3553(a) Factors Weigh Strongly in Favor of Relief

Mr. Itzchaki has accepted responsibility for his crime and has expressed explicit and repeated remorse. Itzchaki Letter of Remorse., Ex. 2 to ECF No. 50. *See United States v. Joling*, No. 6:11-cr-60131-AA,  2020 WL 1903280, at *5 (D. Or. Apr. 17, 2020) (factoring a letter of remorse into the § 3553 analysis). He already served significant time in prison and lives every day in fear of how his family should he fall victim to Covid-19. The punishment he has received is sufficient to deter future misconduct and reflects the seriousness of the crime. 18 U.S.C. § 3553(a)(2)(A)-(B). He is ashamed of the crime he committed and the harm suffered by the diamond merchant and his family.

It defies logic to argue that general deterrence will be affected by his release since we obviously live in extraordinary times; the three years shaved off the sentence, especially if conditioned on a period of home confinement, are necessary to save a man's life and will not be interpreted as a disregard for the law. *Id.*

### D.    Federal courts are releasing prisoners across the country

As S.D.N.Y. Judge Furman recently framed the problem, "Realistically, the best—

perhaps the only—way to mitigate the damage and reduce the death toll is to decrease the jail and prison population by releasing as many people as possible." *United States v. Nkanga*, 18-cr-713, 2020 WL 1529535, at *1 (S.D.N.Y. Mar. 31, 2020).

The nation's courts are in sync with Judge Furman's reasoning. An overwhelming number of courts have granted compassionate release motions. *United States v. Valencia*, 15 CR 163 (AT), 2020 WL 2319323, at *7 (S.D.N.Y. May 11, 2020) (granting compassionate release in light of COVID-19 because "[t]he sentence imposed . . . did not take into account post-sentencing developments in [defendant]'s medical condition or the unhealthy environment in which he is now imprisoned"); *Pena,* 2020 WL 2301199, at *1 (same for defendant who arranged a "violent" armed robbery that "traumatized numerous victims including children"); *Zukerman*, 2020 WL 1659880, at *6 (same for defendant convicted in multi-million dollar fraud scheme motivated by greed, noting that "[t]he severity of Zukerman's conduct remains unchanged. What has changed, however, is the environment where Zukerman is serving his sentence. When the Court sentenced Zukerman, the Court did not intend for that sentence to 'include a great and unforeseen risk of severe illness or death' brought on by a global pandemic"); *United States v. Park*, 16-CR-473 (RA), 2020 WL 1970603 (S.D.N.Y. Apr. 24, 2020) (same for 54-year-old inmate with asthma because COVID-19 presented a high risk of complications and the prison she was in had a large outbreak); *Scparta*, 2020 WL 1910481, at *9 (same for 55-year-old inmate with high blood pressure and hypertension because "the COVID-19 pandemic presents an extraordinary and unprecedented threat to incarcerated individuals"); *United States v. Resnick*, No. 14 CR 810 (CM), 2020 WL 1651508 (S.D.N.Y. Apr. 2, 2020) (same, reasoning that "[r]eleasing a prisoner who is for all practical purposes not deserving of compassionate release during normal times is all but mandated in the age of COVID-19"); *United States v. Perez*, 17 CR. 513-3 (AT), 2020 WL 1546422, at *4 (S.D.N.Y. Apr. 1, 2020) (same where "[t]he benefits of keeping

[defendant] in prison for the remainder of his sentence are minimal, and the potential consequences of doing so are extraordinarily grave"); *United States v. Campagna*, 16 CR 78-01 (LGS), 2020 WL 1489829, at *3 (S.D.N.Y. Mar. 27, 2020) (same, reasoning that "Defendant's compromised immune system, taken in concert with the COVID-19 public health crisis, constitutes an extraordinary and compelling reason to modify to Defendant's sentence"); *United States v. Quintero*, No. 08-cr-6007L, 2020 WL 2175171 (W.D.N.Y. May 6, 2020) (same for inmate who "suffers from diabetes, a compromised immune system, obesity, and hypertension . . . which make him more susceptible than another to contract the virus"); *United States v. Hansen*, No. 07-CR-00520, 2020 WL 1703672 (E.D.N.Y. Apr. 8, 2020) (same in light of COVID-19 pandemic and medical problems); *McCarthy*, 2020 WL 1698732, at *5 (same for 65-year-old inmate with COPD and asthma despite "very serious" armed robbery charge); *United States v. Fields*, No. 2:05-CR-20014-02, 2020 WL 3129056 (WD La. June 11, 2020) (same for 37-year-old inmate with breathing problems since his ability to provide self-care in prison is "greatly diminished" as a result of the pandemic); *United States v. Howard*, No. 4:15-cr-00018-BR, 2020 WL 2200855, at *4 (E.D.N.C. May 6, 2020) (same for 52-year-old inmate with COPD and diabetes, noting the failure of the BOP in stopping cases at Butner Low); *United States v. Reid*, No. 17-cr-00175-CRB-2, 2020 WL 2128855 (N.D. Cal. May 5, 2020) (granting compassionate release based on risks COVID-19 presents to individual with hypertension, high cholesterol, and Valley Fever, which causes lung infection and can result in acute pneumonia); *United States v. Guzman-Soto*, No. 1:18-cr-10086-IT, 2020 WL 2104787 (D. Mass. May 1, 2020) (same for inmate with hypertension at New York facility with a few COVID-19 cases); *United States v. Kelly*, No. 3:13-CR-59-CWR-LRA-2, 2020 WL 2104241, at *7 (S.D. Miss. May 1, 2020) (same for young man without health issues because "it has become increasingly apparent that the BOP has failed to control the outbreak at Oakdale I"); *United States v. Edwards*, No. 6:17-cr-3-NKM, 2020 WL 1650406 (W.D.

Va. Apr. 2, 2020) (same because "[h]ad the Court known when it sentenced Defendant in 2018 that the final 18 months of his term in federal prison would expose him to a heightened and substantial risk presented by the COVID-19 pandemic on account of Defendant's compromised immune system, the Court would not have sentenced him to the latter 18 months"); *Rodriguez*, 2020 WL 1627331, at *1 (same after finding risk factors for COVID-19 constitute extraordinary and compelling reason and noting that prisons are "tinderboxes for infectious disease").

In summation, there is overwhelming persuasive authority to grant compassionate release for an at-risk inmate like Mr. Itzchaki.

### E.    The BOP has had difficulty properly protecting at-risk inmates

Although some courts have deferred to the Bureau of Prisons, claiming that it had "experience combatting infectious diseases and ha[ve] developed and implemented a multi-point plan to battle COVID-19" *United States v. Stevens*, 04-CR-222S, 2020 WL 2393306, at *6 (W.D.N.Y. May 12, 2020) (listing cases), this is simply not the case. After the outbreaks in Lompoc in late May, 2020, the Senate Committee on the Judiciary was moved to grill BOP Director Michael Carvajal and medical director Dr. Jeffery Allen on their COVID-19 response. *Statement on Examining Best Practices for Incarceration and Detention During COVID-19: Hearing Before the S. Comm. on the Judiciary*, 116th Cong. (June 2, 2020), https://www.judiciary.senate.gov/meetings/examining-best-practices-for-incarceration-and-detention-during-covid-19. When questioned by Senator Dianne Feinstein about the Lompoc outbreak, Dr. Allen openly admitted the difficulty of controlling outbreaks in prisons, saying "What happened at Lompoc has happened in many correctional facilities around the country and demonstrates the infectivity of the disease and the difficulty of controlling it in correctional environments." *Id.* (video of hearing at timestamp 1:08:50). Senator Richard Blumenthal

excoriated the Director over the BOP's handling of cases at FCI Danbury in Connecticut.  In *Martinez-Brooks v. Easter*, 3:20-CV-00569 (MPS), 2020 WL 2405350, at *1 (D. Conn. May 12, 2020), the court ordered the warden at FCI Danbury to release all at-risk inmates to home confinement. "The court found that your practices at Danbury 'amount to deliberate indifference to a substantial risk to serious harm to inmates in violation of the eighth amendment,'" Senator Blumenthal said. When the senator asked Director Carvajal if the orders were being fulfilled, the Director pled ignorance. Senator Blumenthal also pressed the Director on the court order barring the use of the 50% marker in home confinement requests. Here too, the Director displayed his maladministration and did not know whether the policy had been changed to reflect the order. *Id.* (video at timestamp 2:16:00).

While these instances mirror the general difficulty governments have had in confronting these novel circumstances, they demonstrate the need to question the BOP's role as arbiter on prisoner safety. For example, Mr. Itzchaki was approved by FCI Cumberland for home confinement under the CARES act twice, only to be refused by the BOP office in D.C.

This disparity seems to be the result of what may be, at best, gross negligence, and at worst, malfeasance. AG Barr's two memos instructed the BOP to release minimum risk prisoners to home confinement, yet recent investigations have uncovered a gross disregard for those instructions. Apparently, the BOP clandestinely amended the requisite PATTERN score necessary for an inmate to be considered minimum risk to the community. Thus, inmates at risk for COVID-19 are being denied home confinement because they, only now, are considered a risk to their communities. *See* Ian MacDougall, *Bill Barr Promised to Release Prisoners Threatened by Coronavirus — Even as the Feds Secretly Made It Harder for Them to Get Out*, ProPublica (May 26, 5:00 AM), https://www.propublica.org/article/bill-barr-promised-to-release-prisoners-threatened-by-

coronavirus-even-as-the-feds-secretly-made-it-harder-for-them-to-get-out ("Fewer prisoners have been released than was expected when the attorney general made his announcement, lawyers say. About 3,050 inmates have been moved to home confinement as of May 21, BOP records show. That's around 1.8% of the people under the bureau's supervision. That figure is significantly smaller than the roughly 20% of inmates who fall into the minimum risk category (though it's not automatic that all of them would qualify for release) under the 2019 rules."). When Senator Sheldon Whitehouse mentioned this article to Director Carvajal at the June 2 hearing, Director Carvajal claimed the revised PATTERN memo was a draft; however, he did not clarify which version the BOP was operating under, saying cryptically, "the approved version." *Hearing Before the S. Comm. on the Judiciary, supra* (video at timestamp 1:37:38).

In one instance, the BOP attempted to resist a federal court order to promote home confinement as a viable safety measure, prompting the Supreme Court to get involved. The Supreme Court decided to deny the BOP's injunction against a federal judge's order regarding the Elkton Prison. The Judge accused the BOP of "thumbing their noses" at AG Barr's directives; while 837 inmates had been deemed high-risk, none of them had been moved to home confinement. The government sought an injunction against the order. *See* Order in Pending Case, *Williams v. Wilson*, 20-cv-794 (May 26, 2020) (mem.), https://www.scotusblog.com/wp-content/uploads/2020/05/19A1041-Williams-v.-Wilson-Order.pdf.; Amy Howe, *Court Rejects – At Least for Now – Government's Request to Block Ohio Prisoner Release Plan*, SCOTUS Blog (May 26, 2020, 2:08 PM), https://www.scotusblog.com/2020/05/court-rejects-at-least-for-now-governments-request-to-block-ohio-prisoner-release-plan/#more-294066.

It is for this reason we turn to this Court as the last line of defense against what one academic has called "The New Death Penalty." Douglas A. Berman, *The New Death Penalty: COVID Has Now*

*Killed More Than 500 US Prisoners and Prison Staff According to UCLA Law Data*, Sentencing &

L. Pol'y Blog (May 27, 2020), https://sentencing.typepad.com/sentencing_law_and_policy/ ("[B]y

killing many hundreds of incarcerated persons, COVID-19 has turned all sorts of other sentences into

functional death sentences.").

## **CONCLUSION**

For all the foregoing reasons, Mr. Itzchaki respectfully requests that the Court take this

opportunity to grant a reduction in his sentence based on extraordinary and compelling reasons

and to reduce his sentence to time served—with or without conditions of home confinement—

and with modified conditions of supervised release.


Date: July 3, 2020
        New York, New York

                                Respectfully submitted,

                                THE SARACHEK LAW FIRM

                                By:   /s/Joseph E. Sarachek

                                Joseph E. Sarachek (NY Bar # 2163228)
                                101 Park Avenue, 27th Floor
                                New York, NY. 10178
                                646 4517-5420
                                646 861-4950 fax